UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
─────────────────────────────────
UNITED STATES OF AMERICA,

    -against-      **MEMORANDUM & ORDER**

COREY JOHN,         **20-CR-341 (NGG)**

      Defendant.
─────────────────────────────────

NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is Defendant Corey John's motion to amend or correct his presentence report ("PSR"). John contends that his Sentencing Guidelines offense level should be reduced because the gun he possessed was not a "firearm" within the meaning of 18 U.S.C. § 921(a)(3) or 26 U.S.C. § 5845(a). For the reasons below, the court DENIES John's motion to amend or correct his presentence report.[1]

### I. BACKGROUND AND PRODCURAL HISTORY

In the evening of May 24, 2020, at a Popeyes restaurant in Brooklyn, Defendant became involved in a verbal dispute with another customer, which escalated to the point that John pulled a gun out from his waistband and brandished it. (PSR (Dkt. 41) at 3.) The other customer notified New York City Police Department officers who were outside the restaurant. (*Id.*) Defendant exited

---

[1] Defendant separately submitted another memorandum styled as a motion for a downward sentencing departure. (*See* Def.'s Sentencing Mem. (Dkt. 52).) One of the arguments proffered for a downward departure recites the same legal arguments denied by this Memorandum & Order. (*Id.* at 5-6.) The court construes that "motion" as a sentencing memorandum presenting a range of mitigating factors for the court to consider. In determining the appropriate sentence for John, the court will consider all of those factors, as well as the others required by 18 U.S.C. § 3553(a).

the restaurant, but then reentered when he saw the police officers approaching him. (*Id.*) He pushed another customer to the side and threw the gun behind the restaurant counter. (*Id.*) The officers arrested Defendant and recovered the gun. The gun was a .380 caliber pistol with a scratched-off serial number. (Gov't Sent. Mem. ("Gov't Mem.") (Dkt. 49) at 2.) One .380 caliber round was loaded in the chamber and another .380 round was inside a magazine that was inserted into the gun. (PSR at 3.)

Later that fall, on September 2, 2020, Defendant was indicted on one count of being a Felon in Possession of Ammunition, in violation of 18 U.S.C. § 922(g)(1). (Indictment (Dkt. 1).) On September 9, 2021, Defendant pled guilty to the single count of the indictment without a written plea agreement. (PSR at 3.)

In the initial PSR submitted on December 2, 2021, the Probation Department calculated a base offense level of 14 and found that a four-level enhancement was appropriate pursuant to Sentencing Guideline § 2K2.1(b)(4)(B) because the offense involved a firearm with an obliterated serial number. (*Id.* at 5.) The Defendant's total offense level was calculated as 15 after adjusting for acceptance of responsibility. In combination with his criminal history category of III, the initial PSR calculated a Sentencing Guidelines range of 24 to 30 months imprisonment. (*Id.* at 12.)

In preparation for sentencing, on January 16, 2022, Defendant's counsel, David Kirby, sent a letter to the Probation Department and the Government objecting to the PSR.[2] Defendant argued that the four-point enhancement for an obliterated serial number on a gun under § 2K2.1(b)(4)(B) was inapplicable because the gun was not a "firearm" as defined in the Gun Control Act of 1968, 18 U.S.C. § 921(a)(3). (Jan. 16, 2022 Ltr. from D. Kirby).) He argued, in summary, that the weapon was not operable and

---

[2] This letter was not filed with the court, but the court requested and received a copy on March 1, 2022 and has appended a copy to this order.

could not be "readily converted to expel a projectile." (*Id.* (citing 18 U.S.C. § 921(a)(3)).)

With the Government's attention alerted to the question of whether the gun was a "firearm," Agent Jason Armstrong of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") examined and tested the firearm on January 27, 2022. By placing duct tape around the cartridge case and removing approximately half of the gun powder, he was able to successfully discharge a shot through the energy of an explosive. (ATF Report (Gov't Ex. A) at 3; Tr. at 38:1-8.)[3] Agent Armstrong used a .32 caliber round, which is approximately 321 thousandths of an inch in diameter, as compared to the .380 round found in the gun, which is approximately 355 thousandths of an inch in diameter. (*Id.* at 36:19-37:18.) According to Defendant's expert, the .32 caliber round is almost one millimeter narrower. (*Id.* at 60:4-7.) Agent Armstrong later testified that he elected to reduce the amount of gunpowder and use the .32 caliber both for safety reasons and to avoid any destruction of the evidence, though it was his opinion that "it would have been perfectly safe to fire" with the standard amount. (*Id.* at 33:9-19, 34:2-10.) Based on his examination, Armstrong concluded that not only was the gun a firearm under 18 U.S.C. § 921(a)(3), but that it was also a firearm under the National Firearms Act, 26 U.S.C. § 5845(a). (ATF Report at 4.)

This information in hand, the Probation Department then doubled down and submitted an addendum to the PSR on February 7, 2022. (Second Addendum to the PSR (Dkt. 48).) The Addendum increased Defendant's base offense level by an additional six points by relying on Sentencing Guideline § 2K2.1(a)(4)(B) because "the offense involved a firearm described in 26 U.S.C.

---

[3] The ATF report does not appear on the docket, though it was introduced as Government Exhibit A during the *Fatico* hearing, so the court has appended a copy to this order.

5845(a)." (*Id.* at 3.) As a result, Defendant's calculated Guidelines range increased to 46 to 57 months imprisonment (from 24 to 30 months). (*Id.*) A total of ten levels, therefore, came to depend on the meaning of the term "firearm": six added into the new base offense level, and four because the offense involved a firearm with an obliterated serial number.

On March 1, 2022, Defendant filed a motion requesting that the court strike the calculation from the PSR relying on the weapon's qualification as a "firearm" under 18 U.S.C. § 921(a)(3) and 26 U.S.C. § 5845(a). (*See* Mot. to Amend/Correct ("Mot.") (Dkt. 51).) On March 3, 2022, this court held a *Fatico* hearing to address the question, during which the parties "introduce[d] evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991); *see also United States v. Fatico*, 603 F.2d 1053 (1979).[4]

At that hearing, both the Government's expert, Agent Armstrong, and Defendant's expert, Harvey Morgan, a licensed gunsmith, testified that John's gun was originally a "starter" gun (as in, to start a race). Though a starter gun has "the appearance of a pistol," it fires a blank cartridge that creates noise that mimics the sound of gunfire. (March 3, 2022 Tr. of *Fatico* Hearing ("Tr.") at 13:19-23.) A starter gun has "a blocking feature" that is typically "incorporated within the barrel" that "prevent[s] [a user] from loading or inserting a round of ammunition." (*Id.* at 14:7-14.) Thus, without alteration, a starter gun "does not expel a projectile." (*Id.* at 13:19-23.) The obstruction had been removed in the gun recovered at the time of John's arrest, and it had been redesigned to accommodate a .380 magazine. (*Id.* at 25:15-20; PSR at 4.) The obstruction in a starter gun, at least in Agent Armstrong's experience, is not always removable, and thus a starter gun is not always convertible. (*Id.* at 16:4-20.) Additionally,

---

[4] When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

4

starter guns are often made with a soft metal that "can't withstand the pressures of firing a cartridge." (*Id.* at 58:1-15.) Morgan explained that, for this reason, in such a converted weapon, "the bullet would probably not get far down the barrel, if at all," and "[t]he metal would entirely rupture." (Morgan Report (Dkt. 51-1) at ECF p. 3.)

## II. DISCUSSION

The parties do not dispute that Defendant was in possession of a gun at the time he committed the crime charged in the indictment. Instead, the dispute is whether the gun in question is a "firearm," as defined by 18 U.S.C. § 921(a)(3) and 26 U.S.C. § 5845(a).

### A. The Serial Number Enhancement: Sentencing Guideline § 2K2.1(b)(4)(B) and 18 U.S.C. § 921(a)(3)

Sentencing Guideline § 2K2.1(b)(4)(B) provides that if a "firearm" has an "altered or obliterated serial number," the offense level should increase by four levels. The Commentary notes that a "firearm" has the meaning given in 18 U.S.C. § 921(a)(3). A "firearm" is defined as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). The Second Circuit has clarified that "[t]he statute was clearly written in the disjunctive," so the gun in question must either be "designed to" *or* "readily be converted" to expel a projectile. *United States v. Rivera*, 415 F.3d 284, 287 (2d Cir. 2005).

Defendant contends that the gun in question may not be readily converted to expel a projectile. Defendant's expert reasoned that "[w]e have to add the additional word 'safely.' If it expels a projectile and maims or kills the user, this would not be considered converting the blank pistol at all." (Morgan Report at ECF p. 2.) Morgan explained that shooting John's jerry-rigged

5

gun would result in the metal rupturing and "shards of metal being spewed out," which would injure anyone in the vicinity. (*Id.* at ECF p. 3.) After learning that Agent Armstrong was able to fire the gun, Morgan stood by his initial conclusion, noting that "Agent Armstrong took great care and time to get this device to discharge," and "ATF personnel are not individuals with 'average mechanical ability using readily available tools.'" (Supplemental Morgan Report (Dkt. 51-2) at ECF p. 2.)[5]

Defendant cites to just one District of Colorado decision in support of his position. *See United States v. Brady*, 710 F. Supp. 290 (D. Colo. 1989). In *Brady*, that court held that a "coyote getter" was not a firearm under 26 U.S.C. § 5845(a) and thus the defendant was not guilty of being a felon in possession of a firearm. A coyote getter is a metal tube that is "buried in the ground with just the [baited] shell holder above the surface." *Id.* at 291. When an animal tries to bite the bait, it "explodes the primer and kills the animal by propelling the cyanide into the animal's mouth." *Id.* The explosion is enabled with the use of "a special .38 caliber shell that consists of a normal .38 shell casing having only a primer, or a primer and a negligible quantity of gunpowder." *Id.* The court noted that "it is obvious that the shell holder was not designed to contain the explosion of a normal round of ammunition, but rather, was intended to keep the cyanide cartridge in place, and hold the bait." *Id.*

The court reasoned that "the device does not materially increase the offensive usefulness of ammunition; that is, a user of the coyote getter does not have a substantially better weapon in the

---

[5] It appears that Mr. Morgan was quoting from his original report in which he stated: "While the expression *readily converted* are the seminal words here, I will presume that this means: able to be converted by a person with average mechanical skill using readily available tools in a reasonable period of time." (Morgan Report at ECF p. 1 n.1.)

coyote getter," *i.e.*, a metal tube, "than he would have with a cartridge by itself." *Id.* at 292. Further, the court surmised that "the device would be so dangerous to the user that only a person bereft of reason would consider using the coyote getter as a firearm." *Id.* The court noted that even though the ATF agent who tested the device was "an experienced firearms expert," he was not willing use to powder in his testing, "even with all the [agency's] resources and equipment" because of safety concerns. *Id.* at 292-93. The court concluded that "this device is so useless as a weapon, and so likely to cause injury to the user, that it cannot be readily distinguished from the variety of common items that could, as a purely theoretical matter, be used to fire ammunition." *Id.* at 293. John emphasizes the court's note that "[r]esearch has found no cases in which a court or administrative agency found that a device which was likely to explode if used with normal ammunition was" a firearm. *Id.* at 293.

At the outset, the court notes that *Brady* is not controlling, and this holding does not appear to have been adopted in other cases in the three decades since *Brady* was decided. The fact that court's research did not identify any cases in which "a device which was likely to explode if used with normal ammunition" was considered a firearm is irrelevant. Even if this court could be persuaded by cases finding that an exploding device *was not* a firearm, the absence of cases finding that an exploding device *is* a firearm is not meaningful evidence. In this case, Agent Armstrong was able to be fire the gun with normal, albeit modified, ammunition, as distinguished from the agent in *Brady*, who didn't use any gunpowder. The expert in *Brady* explained that "[t]he barrel of a gun contains the force of the exploding powder and gives direction to a bullet; however, because "[t]he part of the coyote getter holding the cartridge is only slightly longer than the shell casing itself . . . [,] it would not effectively contain the gasses to propel the bullet and could not serve to direct the bullet." *Id.* at 292. It seems that the expert's explanation for why the

7

coyote getter could not effectively propel and direct a bullet would not be applicable to a gun with a barrel. Finally, the weapon in this case, a gun carried and concealed on a person, is materially different than a metal tube turned animal trap that projects from the ground. The federal firearm laws were enacted to regulate guns, not animal traps.

The Government points the court to *United States v. Rivera*. 415 F.3d 284 (2d Cir. 2005). Rivera was charged with being a felon in possession. However, the loaded .380 caliber semi-automatic pistol in question was "subsequently determined to be inoperable" due to issues with the firing pin. *Id*. at 285. The court held that "an inoperable pistol is a firearm within the meaning of § 921(a)(3)." *Id*. at 286. However, the Second Circuit reasoned that "the gun was *originally designed* to fire a bullet." *Id*. (emphasis added). Here, Defendant's gun was not originally designed to expel a projectile since it was a starter gun. Though it does seem that it may have been *re*designed to expel a projectile when the obstruction was removed, the court declines to rely on that assumption. Since the panel found that the gun was "*designed*…to expel a projectile," it did not consider whether the gun "may *readily be converted* to expel a projectile." *Id*. at 287 (emphasis added). Still, *Rivera* stands for the proposition that federal courts have broadly interpreted the meaning of a firearm under § 921(a)(3).

In *United States v. 19,179 Molso Italian .22 Caliber Winler Derringer Convertible Starter Guns*, the Second Circuit considered whether a starter gun was readily convertible. 443 F.2d 463 (2d Cir. 1971). The panel found that because the starter guns "could be converted to shoot live ammunition within three to twelve minutes," they "were readily convertible" and thus were firearms under the statute. This time frame is comparable to the twenty to thirty minutes that Agent Armstrong testified that he spent in

the range testing Defendant's gun. (Tr. at 35:3-9.) While Defendant's expert points to the fact that ATF agents are highly trained specialists, the panel in *19,179 Starter Guns* was not concerned about whether the average person could do the same. Further, Defendant seems to argue that a starter gun can't be a firearm under § 921(a)(3) since it was not designed to expel a projectile, would be too dangerous to fire as is, and would take too long to convert. This argument is clearly at odds with *19,179 Starter Guns* as well as with the language of the statute. The statute explicitly includes starter guns, which, the court agrees with Defendant, are not "designed to" expel a projectile. However, it would be incoherent to include starter guns in the language of § 921(a)(3) if starter guns could also never be "readily converted."

District courts in this circuit have similarly liberally applied the definition in § 921(a)(3) when faced with the question of what constitutes a "firearm." In *United States v. Bacote*, the court declined to prevent the government from introducing an inoperable firearm since "[w]hether the firearm was operable is not an element" of being a felon in possession, which relies on the definition in § 921(a)(3). No. 15-CR-378(FB), 2016 WL 1089260, at *1 (E.D.N.Y. Mar. 18, 2016). The court noted that the gun's "inoperability was caused by a defect in the main spring, which was not readily apparent to the recovering officers, and was not likely apparent to whomever actually possessed the gun because it was fully loaded when seized." *Id*. So too here, Defendant carried a loaded gun, which suggests that he may not have been aware of any potential issues with its operation. (Tr. at 28:2-12.) In *United States v. Morales*, the court held that a "partially-disassembled Tec-9 pistol" was a firearm under § 921(a)(3) because it was "clearly designed to, *and* could readily be converted to expel a projectile." 280 F. Supp. 2d 262, 272 (S.D.N.Y. 2003) (emphasis added). The court quoted § 921(a)(3)'s legislative history, which notes that it is "clear that so-called unserviceable firearms come within the definition." *Id*. at 273.

The only limit on what constitutes a firearm under § 921(a)(3) that the Second Circuit has identified is in a footnote, which provides that "not all guns are firearms—BB guns and staple guns, for example, are not." *United States v. Rosa*, 507 F.3d 142, 145 n.1 (2d Cir. 2007).

Here, Defendant carried a loaded gun on his person, from which Agent Armstrong was able to expel a projectile in twenty to thirty minutes. Given that the Second Circuit found that a starter gun was readily able to expel a projectile when it was converted in a similar time frame, and the liberal interpretation that has been afforded to inoperable guns in this circuit under § 921(a)(3), the court finds that the gun is a firearm under § 921(a)(3), and the sentencing enhancement under § 2K2.1(b)(4)(B) is appropriate.

### B. The Base Offense Level: Sentencing Guideline § 2K2.1(a)(5) and 26 U.S.C. § 5845(a)

Sentencing Guideline § 2K2.1(a)(5) provides that in a case involving the unlawful possession of ammunition, there is a base offense level of 18 if "the offense involved a firearm described in 26 U.S.C. § 5845(a)." There are multiple items defined as firearms in 26 U.S.C. § 5845(a). At issue here is the catchall phrase "any other weapon," which is defined as:

> [A]ny weapon or device capable of being concealed on the person *from which a shot can be discharged through the energy of an explosive,* a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, *and shall include any such weapon which may be readily restored to fire.*

10

26 U.S.C. § 5845(e) (emphasis added).[6]

Defendant concedes that the gun has smooth bore because the barrel had been drilled out. (Mot. at 11.; *see also* Tr. at 26:1-27:4) Defendant also does not dispute that the gun is concealable. (Def.'s Sentencing Memo. (Dkt. 52) at 6.) Instead, Defendant argues that the issue is whether the gun could be "readily restored to fire." (Mot. at 11.) Since the gun was originally a pistol that shot only blanks, Defendant contends that if the gun were to be "restored" to its original condition, as the Oxford dictionary defines this term, it would not be fireable. (*Id.*) Thus, the gun cannot be "restored" to fire. Notably, in the case cited in Defendant's January 16, 2022 letter, the court found that "the definition of 'restore' does not preclude an object from being considered 'restored' without returning it to a condition in which it previously existed." *United States v. One TRW, Model M14, 7.61 Caliber Rifle*, 441 F.3d 416, 424 (6th Cir. 2006) (noting broader definitions of restored, such as "to put or bring back (as into existence or use)" or "to bring back from. . . a changed condition"). In the alternative, if the court adopts a broader definition of restored along the lines of "convert," Defendant directs the court to its §

---

[6] The court notes that 26 U.S.C. § 5845(a) includes "a destructive device," which is defined as "any type of weapon by whatever name known which will, or which *may be readily converted to, expel a projectile by the action of an explosive or other propellant,* the barrel or barrels of which have a bore of more than one-half inch in diameter." 26 U.S.C. § 5845(f) (emphasis added). This definition is nearly identical to § 921(a)(3). The parties did not address whether the gun was a firearm as defined in § 5845(f), and the court is not aware of the diameter of the gun's barrel. Given that the court has found that the gun is a firearm based on interpretations of nearly identical language in § 921(a)(3), the court notes that this may be another provision under which the gun could be considered a firearm and thus another avenue through which the application of § 2K2.1(a)(5) is appropriate.

11

921(a)(3) argument that the gun cannot "readily" be restored. (Mot. at 11 n.2.)[7]

Even taking Defendant's conception of "readily restored to fire," the definition in § 5845(e) also applies to "any weapon or device. . . *from which a shot can be discharged through the energy of an explosive.*" 26 U.S.C. § 5845(e) (emphasis added). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Gravel*, 645 F.3d 549, 551 (2d Cir. 2011) (analyzing the meaning of "designed to" in § 5845(b)). Based on the plain meaning of this clause in § 5845(e), this is a broader definition than § 921(a)(3), which requires that the weapon "will," "is designed to," or "may readily be converted." The language of § 921(a)(3) suggests to the court that the gun must be currently able to dispel a projectile ("will"), was designed to expel a projectile ("designed to"), or can be made able to expel a projectile within some relatively short period of time ("readily be converted"). There are no such limitations in § 5845(e), which suggests that any gun from which it is possible to expel an explosive ("can be discharged") would constitute a firearm, readily or not.

At least one court in this district has followed that broad interpretation of a firearm. In *United States v. Sagginario*, Defendant made a homemade handgun from "approximately 5 inch by 1/2

---

[7] At least one case in this circuit sheds light on how "readily" a gun must be restored. *See United States v. Catanzaro*, 368 F. Supp. 450, 453 (D. Conn. 1973). The gun was inoperable when the defendant was arrested for possessing a firearm. To restore the gun, the ATF agent had to get parts from the manufacturer that had purchased the original manufacturer's inventory when it had gone out of business. *Id.* at 452. The reassembly cost $15 and took about an hour. *Id.* Still, the court found that the gun was "readily restored to fire" under 26 U.S.C. § 5845(a), (d), and (e).

inch diameter plumbing pipe with a 3/4 inch threaded fitting on both ends." 00-CR-806 (JG), 2001 WL 185051, at *3 (E.D.N.Y. Feb. 16, 2001). The court found that the Government could "readily prove" that Defendant's handmade gun was a firearm under 26 U.S.C. §§ 5845(a) and (e) after it was successfully test fired at the ATF laboratory.[8]

Courts outside of this circuit have generally interpreted this provision it in a similar manner. In *United States v. Griffin*, the court found that "a flare gun with ammunition modified to contain projectiles (BBs) to be propelled by an explosive" was "capable of being concealed on the person from which a shot can be discharged through the energy of an explosive." No. 07-CR-186, 2007 WL 4287509, at *2, *4 (D. Neb. Dec. 4, 2007); *see also United States v. Coston*, 469 F.2d 1153, 1153 (4th Cir. 1972) (holding that a flare gun "loaded with a shotgun shell" was a firearm because it "had a length of 5 ⅜ inches," "a smooth bore," and "proved capable of being used as a shotgun when test-fired"). The court was not persuaded by the defendant's argument that ATF never test-fired the device because "it would have been unsafe . . . to actually fire the device." *Griffin*, 2007 WL 4287509, at *5. In *United States v. Decker*, the court found that a tear gas gun, which was not loaded at the time of the offense, was a firearm because the Firearm Section of the IRS was able to test-fire it with commercial ammunition, and "the firing did not rupture the barrel of the gun or cause any structural damage thereto." 292 F.2d 89, 90 (6th Cir. 1961).

Some courts outside of the Second Circuit have adopted somewhat narrower interpretations of a firearm, but even under these interpretations, the gun found on Defendant's person is still a firearm under 26 U.S.C. § 5845(e). In *United States v. Seven Miscellaneous Firearms*, the court held that a "gyrojet" was not a

---

[8] As in this case, ATF found that the homemade gun was a firearm under both § 921(a)(3) and § 5845(a) and (e).

13

firearm since it was not operable—it "could not discharge a shot or expel a projectile"—at the time of seizure. 503 F. Supp. 565, 577 (D.D.C. 1980). The court temporally narrowed the language in § 5845(e), effectively holding that the shot must be dischargeable at the moment of the seizure, or in John's case, during the commission of the offense. The court noted that "[t]here is no known source from which gyrojet ammunition can be obtained for these items," and "[t]he special ammunition required for a gyrojet pistol . . . has not been manufactured for some years and none of the expert witnesses who testified knew where it could be procured." *Id*. But even taking the court's narrower view, this court understands that Defendant's gun was theoretically fireable at the time of the commission of the offense. Further, unlike the gyrojet, ammunition for John's gun was readily and commercially available.

In *United States v. Thompson*, the court found that the shotgun in question was not a firearm because "a shotgun without a firing pin cannot be fired without the aid of external objects." 202 F. Supp. 503, 506-507 (N.D. Cal. 1962). While the broad language of the statute and interpretations in other courts suggests that anything that can be made fireable is a firearm under § 5845(e), *Thompson* supports the proposition that once external parts are needed to effectuate discharge, a gun is not a firearm. *Id*. (noting a case that "distinguished the situation where the gun was disassembled, so that it could be immediately put together and be in operating condition"). Even under this more contained definition, John's gun was a firearm, as no external parts or modifications were needed to expel a projectile.

Because John's gun had a smooth bore, was concealable, and Agent Armstrong was able to discharge a shot through the energy of an explosive, the court finds that it is a firearm under 26 U.S.C. §§ 5485(a) and (e), and thus the application of Sentencing Guideline § 2K2.1(a)(5) is appropriate.

### III. CONCLUSION

For the reasons explained above, Defendant's motion to amend or correct his presentence report is DENIED.

SO ORDERED.

Dated:    Brooklyn, New York
          April 8, 2022

                                              /s/ Nicholas G. Garaufis
                                              NICHOLAS G. GARAUFIS
                                              United States District Judge